## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 31 2018, 10:59 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT MOTHER

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEY FOR APPELLANT FATHER

Matthew J. Lorenzo
Lorenzo Bevers Braman & Connell
Seymour, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re Termination of the Parent-Child Relationship of: S.H. and A.H., Minor Children,

K.H., Mother, and R.H., Father,

*Appellants*,

v.

The Indiana Department of Child Services,

*Appellee*.

December 31, 2018

Court of Appeals Case No.
18A-JT-1657

Appeal from the Jackson Superior Court

The Honorable Bruce A. MacTavish, Judge

Trial Court Cause Nos.
36D02-1707-JT-32
36D02-1707-JT-33

**Brown, Judge.**

[1] K.H. ("Mother") and R.H. ("Father," and together with Mother, "Parents") appeal the involuntary termination of their parental rights with respect to S.H. and A.H. We affirm.

## Facts and Procedural History

[2] On July 25, 2017, the Indiana Department of Child Services ("DCS") filed a petition for termination of Parents' parental rights as to S.H., born on October 15, 2010, and A.H., born on February 18, 2015. On January 17, 2018, and February 21, 2018, the court held an evidentiary hearing.

[3] On June 11, 2018, the court entered an order terminating Parents' parental rights, which found that there was a reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside of Parents' home will not be remedied and provided:

> 5. On or about 6/4/2016, the family became involved with DCS when DCS received a report alleging the children were victims of neglect. More specifically, the facts are the family had been living in a hotel but were homeless. Mother and Father did not have a place for the children to stay that evening. Upon receiving the report, DCS gave Mother and Father an opportunity to find appropriate housing. Mother and Father agreed that the children would reside with an acquaintance until they could find appropriate housing. After five (5) days, the family still did not have housing and they were then homeless. Mother admitted methamphetamine use to DCS staff. [S.H.] reported seeing Mother and Father smoke something that "looked like flour" to DCS staff. Parents refused two requests for drug screen[s].
>
> 6. The children were removed from [Parents'] care on 6/8/2016.

7. On 6/10/2016, DCS filed its petition alleging that children were Children in Need of Services (CHINS).

8. On 6/10/2016, the Court held a detention hearing, and upheld the removal of the children. Mother and Father denied the allegations set forth in the petition and an Initial Hearing was set for 6/20/16. Mother and Father submitted to a drug screen at that time.

9. On 6/14/2016, DCS received the results of Mother's and Father's drug screens. They were negative.

10. On 6/20/2016, the Court held an initial hearing. Since the filing of the petition, the parents were able to secure a position at Anchor House under the stipulation that the children would reside with them by 6/20/2016 and Mother and Father would maintain negative drug screens. After DCS advised the Court of Mother and Father's drug screen results, Mother and Father's housing situation, and the stipulations from Anchor House, the children were allowed to return home, to Anchor House, and DCS was pursuing the case as an in-home CHINS. The Court set a Fact Finding Hearing for 7/23/16. DCS drug-screened Mother and Father after the hearing.

11. Mother and Father submitted to drug screens at Anchor House on 6/21/2016. Mother tested positive for methamphetamine and was kicked out of Anchor House. Father was allowed to stay at Anchor House with the children.

12. On 6/23/2016, DCS drug screened Mother and Father. Both Mother and Father tested positive for methamphetamine and amphetamine. DCS sought and obtained an emergency custody order for the children, which the Court entered on 6/23/2016. The Court set a detention hearing for 6/27/2016.

13. On 6/27/2016, the Court conducted a Detention Hearing, upheld the detention of the children, and approved placement of the children with the children's sister's teacher and her husband.

14.  On 6/29/2016, DCS, Mother and Father entered into stipulations for admission of CHINS and agreed dispositional orders.  Specifically Mother and Father admitted that they both suffer from substance abuse problems, they have encountered difficulty providing stable housing for the children and that the intervention of DCS and the Court is necessary to provide substance abuse treatment and services to obtain and maintain stable housing.

15.  On 7/5/2016, the Court issued an order accepting the stipulation of CHINS and agreed dispositional order, adjudicated the children as Children in Need of Services and issued a dispositional order according [to] the agreed terms.

16.  The Dispositional Order, in which DCS was granted wardship of the children, and Mother and Father were ordered to, in relevant part,

> a.  Participate in weekly visitation with the children,
>
> b.  Complete a substance abuse assessment and a parenting assessment, and follow all recommendations from the assessments,
>
> c.  Participate in home-based case management services and follow recommendations,
>
> d.  Submit to random drug screens,
>
> e.  Obtain and maintain appropriate housing,
>
> f.  Engage in therapy with [S.H.] if recommended by the therapist.

**FACTS RELATING TO CHILDREN'S CONTINUED REMOVAL FROM PARENTS' HOME AND CARE: REASONABLE PROBABILITY OF PARENTS NOT REMEDYING REASONS FOR REMOVAL, THREAT TO CHILDREN'S WELLBEING, CHILDREN'S BEST INTEREST, & DCS PLAN FOR CARE AND TREATMENT**

17. After the Dispositional Decree of 7/5/2016, the children were never returned to the parents' care and custody.

18. On 7/28/16, DCS referred Mother to Centerstone for a substance abuse evaluation. Mother never completed this assessment.

19. On 2/13/17, DCS re-referred Mother to Centerstone for a substance abuse assessment. Mother completed this assessment on 3/16/2017. Centerstone recommended Mother for the dual diagnosis program. Centerstone diagnosed with Methamphetamine Use Disorder, Cannabis Use Disorder, Borderline Personality Disorder and PTSD.

20. DCS referred Mother for the Dual Diagnosis Treatment on 3/17/17. Mother's participation in treatment was as follows:

> a. March 2017: Participated in assessment on 3/16/17 – attended 0 of 0 sessions[.]
>
> b. April 2017: Participated in 1 of 7 sessions.
>
> c. May 2017: Referral remains open; Mother attended 0 of 6 sessions.
>
> d. June 2017: Referral remains open; Mother attended 0 sessions.
>
> e. July 2017: Referral remains open; Mother attended 0 sessions.
>
> f. August 2017: Referral remains open; Mother attended 0 sessions this month – 8/23/17 Mother notified FCM that she wanted services transferred to Jennings County. Services transferred immediately.
>
> g. September 2017: Scheduled to meet Centerstone on 9/7/17. No showed appointment. Mother attended 0 sessions.
>
> h. October 2017: Referral remains open; Mother attended 0 sessions.

i.  November 2017: Attended Individual Therapy on 11/16/17 – no showed all other appointments.

j.  December 2017: Attended 0 sessions.

k.  January 2018: Attended 0 sessions.

21.  DCS referred Mother to Ireland Home Based Services for case management on 6/15/2016.  Mother's participation in these services was as follows:

a.  June 2016: Mother met with Ireland on 6/30/16 to go over paperwork.

b.  July 2016: Mother attended 0 sessions.

c.  August 2016: Mother attended 0 sessions.

d.  September 2016: Mother attended 0 sessions.

e.  October 2016: Mother attended 2 of 4 sessions; no showed 2 sessions.

f.  November 2016: Mother attended 1 of 5 sessions.

g.  December 2016: Mother attended 2 of 5 sessions.

h.  January 2017: Mother attended 1 of 5 sessions.  Mother no showed CFTM on 1/31/17.

i.  February 2017: Mother attended 1 of 3 sessions. Service was transferred to Lifeline.

j.  Referred to Lifeline on 2/15/17 (Robert Hempstead).

k.  February 2017: Mother attended 3 of 3 sessions.

l.  March 2017: Mother attended 6 of 6 sessions.

m.  April 2017: Mother attended 1 of 1 session.  Service was transferred to NYAP due to safety issues.

n.  Referred to NYAP on 4/18/2017 (Vanessa Smith, Sarah Degler).

o.  April 2017: Mother attended 1 of 2 sessions.  Met with home-based caseworker on 4/26/2017 for paperwork.

p. May 2017: Mother attended 0 of 3 sessions.

q. June 2017: Mother attended 0 sessions.

r. July 2017: Mother attended 0 sessions.

s. August 2017: Mother attended 0 sessions.

t. Referred to Centerstone on 8/23/2017 (Maggie Twomey, Cassandra Lepage).

u. September 2017: Mother attended 0 sessions. Was scheduled on 9/7/17 but no showed the appointment. Rescheduled for 9/15/17, but no showed this appointment also.

v. October 2017: Mother attended 0 sessions.

w. November 2017: Mother attended 0 sessions.

x. December 2017: Mother attended 0 sessions.

z. January 2018: Mother attended 0 sessions.

22. DCS referred Mother to Ireland on 6/15/2016 for supervised visitation with the children.

a. June 2016: Mother filled out paperwork on 6/30/2016.

b. July 2016: Mother attended 3 of 8 visits.

c. August 2016: Mother attended 2 of 4 visits – Mother would not go to 1 visit indicating Mother and Father were not getting along.

d. September 2016: Mother attended 4 of 4 visits.

e. October 2016: Mother attended 6 of 6 visits; 1 visit ended early due to child's behavior and parents requested visit end.

f. November 2016: Mother attended 8 of 8 visits.

h. December 2016: Mother attended 7 of 7 visits.

g. January 2017: Mother attended 3 of 8 visits.

h. February 2017: Mother attended 0 of 0 visits through Ireland. Ireland canceled services on 2/1/2017 without notifying DCS prior. They indicated the inability to provide a therapeutic level of visits. On 1/31/2017 Ireland and Centerstone attended a CFTM in which the parents no showed. CFTM was being held due to parents no showing visits and lack of home-based casework participation. FCM immediately began looking for a new provider. FCM offered to supervise a visit on 2/8/2017 and parents denied that option. FCM also offered to supervise a visitation [on] 2/8/2017 and parents denied that option.

i. Referred to Lifeline on 2/15/2017 (Robert Hempstead).

j. February 2017: Mother attended 4 of 4 visits.

k. March 2017: Mother attended 8 of 8 visits.

1. April 2017: Mother attended 3 of 3 visits with Lifeline. On 4/11/2017 it was brought to the attention of DCS that the Visit Supervisor was enabling the parents to have unsupervised access to the children. Parents were threatening the children about a current open sex abuse assessment. Lifeline was unable to provide another person for visits.

m. Referred on 4/19/2017 to Ireland for Therapeutic Visitation (Jeannie Arbuckle).

n. April 2017: Mother attended 1 of 1 visit. Mother met with Ireland on 4/26/2017 to sign paperwork and had a visit on 4/29/2017.

o. May 2017: Mother attended 0 of 1 visit. Visit had been scheduled for every 2 weeks due to children['s] school schedules and availability of Ireland – parents had agreed to this. On 5/20/2017 - Parents canceled visit just a couple of hours prior to visit. Parents refused to give a reason.

p. June 2017: Mother attended 2 of 3 visits. Parents were late for 1 visit and canceled a visit.

q. July 2017: Mother attended 2 of 3 visits. Parents were late to one of the visits.

r. August 2017: Mother attended 5 of 5 visits.

s. September 2017: Mother attended 3 of 3 visits. A fourth visit was offered but 2 children were ill and [S.H.] refused to go alone.

t. October 2017: Mother attended 3 of 4 visits.

u. November 2017: Mother attended 1 of 5 visits.

v. December 2017: Mother attended 1 of 4 visits.

w. January 2018: Mother no showed both visits.

23. In October 2017, DCS referred Mother for a Psychological Evaluation through Connections – Dr Cacciola. Mother's participation with these services was as follows:

a. November 2017: Parents had not contacted Connections.

b. December 2017: Mother scheduled for a Psychological Evaluation on 12/7/2017. She was given a gas card to help with transportation. Mother did not attend her appointment and failed to reschedule.

24. On 7/28/2016 DCS referred Father for a substance abuse assessment through Centerstone. Father never completed this assessment. DCS re-referred Father to Centerstone on 2/13/2017 for another substance abuse assessment. Father completed this assessment on 3/16/2017. Centerstone diagnosed Father with Methamphetamine Use Disorder, Cann[a]bis Use Disorder and recommended Father for Intensive Outpatient Treatment.

25. On 3/17/2017, DCS referred Father to Centerstone for Intensive Outpatient Treatment. Father's participation in these services was as follows:

a. March 2017: Father participated in assessment on 3/16/17 – attended 0 of 0 sessions.

b. April 2017: Participated in 0 sessions. Father indicated he was not going to do Intensive Outpatient Treatment.

c. May 2017: Referral remains open; Father attended 0 sessions.

d. June 2017: Referral remains open; Father attended 0 sessions.

e. July 2017: Referral remains open; Father attended 0 sessions.

f. August 2017: Referral remains open; Father attended 0 sessions this month – 8/23/2017 Father notified FCM that he wanted services transferred to Jennings County. Services transferred immediately.

g. September 2017: Scheduled to meet Centerstone on 9/7/2017. No showed appointment. Father attended 0 sessions.

h. October 2017: Referral remains open; Father attended 0 sessions.

i. November 2017: Father attended 0 sessions.

j. December 2017: Father attended 0 sessions.

k. January 2018: Father attended 0 sessions.

26. On 6/15/2016, DCS referred Father to Ireland Home Based Services for Home-based Case Management. Father's participation in these services was as follows:

a. June 2016: Father met with Ireland on 6/30/16 to go over paperwork.

b. July 2016: Father attended 0 sessions.

c. August 2016: Father attended 0 sessions.

d. September 2016: Father attended 0 sessions.

e. October 2016: Father attended 2 of 4 sessions. Father no showed 2 sessions.

f. November 2016: Father attended 1 of 5 sessions.

g. December 2016: Father attended 2 of 5 sessions.

h. January 2017: Father attended 1 of 5 sessions. Father no showed CFTM on 1/31/17.

i. February 2017: Father attended 1 of 3 sessions. Service was transferred to Lifeline.

j. Father referred to Lifeline on 2/15/2017 (Robert Hempstead)[.]

k. February 2017: Father attended 3 of 3 sessions.

1. March 2017: Father attended 6 of 6 sessions.

m. April 2017: Father attended 1 of 1 session. Service was transferred to NYAP due to safety issues.

n. Father referred to NYAP on 4/18/2017.

o. April 2017: Father attended 1 of 2 sessions. Father met with home-based caseworker on 4/26/2017 for paperwork.

p. May 2017: Father attended 0 of 3 sessions. Parents canceled 1 visit and no showed 2 visits.

q. June 2017: Father attended 0 sessions.

r. July 2017: Father attended 0 sessions.

s. August 2017: Father attended 0 sessions.

t. Father Referred to Centerstone on 8/23/2017.

u. September 2017: Father attended 0 Sessions. Father was scheduled on 9/7/2017, but no showed the appointment. Rescheduled for 9/15/17, but no showed this appointment also.

v. October 2017: Father attended 0 sessions.

w. November 2017: Father attended 0 sessions.

x. December 2017: Father attended 0 sessions.

z. January 2018: Father attended 0 sessions.

27. On 6/15/2016, DCS referred Father to Ireland Home Based Services for supervised visitation. Father's participation in these services was as follows:

a. June 2016: Parents filled out paperwork on 6/30/2016.

b. July 2016: Father attended 3 of 8 visits.

c. August 2016: Father attended 3 of 4 visits.

d. September 2016: Father attended 4 of 4 visits. 1 visit was shortened at request of parent.

e. October 2016: Father attended 6 of 6 visits; 1 visit ended early due to child's behavior and parents requested visit end.

f. November 2016: Father attended 8 of 8 visits.

g. December 2016: Father attended 7 of 7 visits.

h. January 2017: Father attended 3 of 8 visits.

i. February 2017. Father attended 0 of 0 visits through Ireland. Ireland canceled services on 2/1/2017 without notifying DCS prior. They indicated the inability to provide a therapeutic level of visits. On 1/31/2017 Ireland and Centerstone attended a CFTM in which the parents no showed. CFTM was being held due to parents no showing visits and lack of home-based casework participation. FCM immediately began looking for a new provider. FCM offered to supervise a visit on . . . 2/18/2017 and parents refused that option. FCM also offered to supervise a visitation [on] 2/8/2017 and parents refused that option.

j. Referred to Lifeline on 2/15/2017 (Robert Hempstead)[.]

k. February 2017: Father attended 4 of 4 visits.

1. March 2017: Father attended 8 of 8 visits.

m. April 2017: Father attended 3 of 3 visits with Lifeline. On 4/11/2017 it was brought to the attention of DCS that the

Visit Supervisor was enabling the parents to have unsupervised access to the children. Parents were threatening the children about a current open sex abuse assessment. Lifeline was unable to provide another person for visits.

n. Referred on 4/19/2017 to Ireland for Therapeutic Visitation (Jeannie Arbuckle).

o. April 2017: On 4/26/2017 Father refused to sign paperwork for Ireland. He left the building cursing loudly. Father rescheduled the meeting for 4/28/2017 but no showed the appointment. Father signed the visit rules on 5/12/2017.

p. May 2017: Father attended 0 of 1 visit. Visit had been scheduled for every 2 weeks due to children['s] school schedules and availability of Ireland – parents had agreed to this. On 5/20/2017 – Parents canceled visit just a couple of hours prior to visit. Parents refused to give a reason.

q. June 2017: Father attended 2 of 3 visits. Parents were late for 1 visit and canceled a visit.

r. July 2017: Father attended 2 of 3 visits. Parents were late to one of the visits.

s. August 2017: Father attended 5 of 5 visits.

t. September 2017: Father attended 3 of 3 visits. A fourth visit was offered but 2 children were ill and [S.H.] refused to go alone.

u. October 2017: Father attended 3 of 4 visits.

v. November 2017: Father attended 0 of 5 visits.

w. December 2017: Father attended 1 of 4 visits.

x. January 2018: Father attended 0 visits.

28. In October, 2017, DCS referred Father for a Psychological Evaluation through Connections – Dr Cacciola. Father's Participation in these services were as follows:

a. November 2017: Father had not contacted Connections

b.  December 2017: Father scheduled for a Psychological Evaluation on 12/8/2017.  Mother was given a gas card to help with transportation.  Father did not attend his appointments and failed to reschedule.

29.  Mother and Father have failed to maintain consistent housing.  Their housing history is as follows:

a.  June 2016: Homeless, Anchor House from 6/16/2016-6/23/2016.  Parents were living in Jeep immediately prior to removal of the children.

b.  July 2016: Homeless.

c.  August 2016: Homeless.

d.  September 2016: Homeless.

e.  October 2016: Homeless.

f.  November 2016: Homeless.

g.  December 2016: Homeless.

h.  January 2017: Homeless.

i.  February 2017: Homeless and then temporary housing arranged through Lifeline.

j.  March 2017: Lost housing on 3/27/2017 due to being disrespectful to the homeowners and unsanitary.  Immediately moved in with Father's sister in Edinburgh.

k.  April 2017: Living with Father's sister in Edinburgh.

l.  May 2017: 5/20/2017 – Notified DCS they had been kicked out of Father's sister['s] home.  Refused to indicate why.

m.  June 2017: 6/8/2017 Parents indicated to DCS they were living in Madison – refused an address.

n.  July 2017: Living with friends in Columbus – no address given.

o.  August 2017: Living with friends in Columbus – no address given.

p. September 2017: Living with friends in Columbus – no address given.

q. October 2017: Living with friends in Columbus – no address given.

r. November 2017: Living with friends in Columbus – no address given; parents indicate they are not living together.

s. December 2017: Parents are back together. Living with friends. Refuse to give address[.]

t. January 2018: Homeless – living with friends.

u. Mother and Father appeared at the 2/21/2018 continued Fact Finding Hearing with copy of lease to an apartment at Arbors at Waters Edge in Columbus, IN. The parents failed to establish that they had the income to maintain paying the rent beyond the initial subsidized period.

30. Mother and Father have failed to maintain consistent employment. Mother and Father's employment history is as follows:

a. June 2016: Unemployed – Father reported he quit job at Indiana Steel. Parents were observed at time children were removed to be panhandling in front of Seymour Walmart.

b. July 2016: Unemployed.

c. August 2016: Unemployed.

d. September 2016: Unemployed.

e. October 2016: Unemployed.

f. November 2016: Unemployed.

g. December 2016: Unemployed.

h. January 2017: Unemployed.

i. February 2017: Employed at Steak & Shake.

j. March 2017: Employed at Steak & Shake.

k. April 2017: Employed at Steak & Shake.

l. May 2017: Employed at Steak & Shake.

m. June 2017: Unemployed.

n. July 2017: Unemployed.

o. August 2017: Unemployed.

p. September 2017: Both reported employment at NVIC.

q. October 2017: Mother reports employment at NVIC; Father unemployed.

r. November 2017: Father unemployed; Mother was fired for missing to [sic] many days at the end of November.

s. December 2017: Both parents unemployed. Seen pan handling at Wal-Mart on 12/26/2017 by FCM Claycamp.

t. January 2018: Parents unemployed.

u. Father appeared for the 2/21/2018 continued Fact Finding Hearing with paystubs from First Call Temporary Services, Inc. Father received payment as follows:

 i. Week of 1/21/2018, $352.00.

 ii. Week of 1/28/2018, $346.50.

 iii. Week of 2/4/2018, $324.50.

The Court received evidence that Father is no longer working due to an injury.

v. Mother appeared for the 2/21/2018 continued Fact Finding Hearing with paystubs from First Call Temporary Services, Inc. Mother received payment as follows:

 i. 1/25/2018, $352.00.

 ii. 2/1/2018, $346.50.

 iii. 2/8/2018, $8.25.

31. Mother and Father inconsistently drug screened since the Court ordered the children be detained. Mother's drug screen history is as follows:

a. 6/10/2016, Negative.

b. 6/20/2016, Positive, Amephetamine [sic], 92.8 ng/mL; Methamphetamine, 228.5 ng/mL.

c. 8/22/2016, Positive, THC, .08 ng/mL.

d. 10/24/2016, Negative.

e. 3/15/2017, Positive, THC, 1.0 ng/mL.

f. 3/27/2017, Positive, THC, 41.2 ng/mL.

g. 4/6/2017, Positive, THC, 1.4 ng/mL.

h. 4/26/2017, Negative.

i. 7/20/2017, Negative.

j. 8/23/2017, Positive, THC, 1.0 ng/mL.

k. 8/25/2017, Positive, THC, 1.7 ng/mL.

l. 9/27/2017, Positive, THC, 4.4 ng/mL.

m. 10/11/2017, Positive, THC, 4.4 ng/mL.

n. 11/14/2017, Positive, 25.7 ng/mL.

o. 12/5/2017, Positive, 15.0 ng/mL.

Father's drug screen history is as follows:

a. 6/10/2016, Negative.

b. 6/20/2016, Positive, Amphetamine, 101.0 ng/mL; Methamphetamine, 357.7 ng/mL.

c. 8/22/2016, Positive, THC, 4.4 ng/mL.

d. 3/17/2017, Positive, THC, 1.9 ng/mL.

e. 3/22/2017, Positive, THC, 55.3 ng/mL.

f. 4/10/2017, Positive, THC, 2.3 ng/mL.

g. 4/26/2017, Positive, THC, 1.0 ng/mL.

h. 7/20/2017, Negative[.]

i. 8/25/2017, Negative[.]

j. 9/27/2017, Positive, THC, 80.4 ng/mL.

k. 10/11/2017, Positive, Amphetamine, 14.5 ng/mL; Methamphetamine, 66.0 ng/mL; THC, 8.0 ng/mL.

l. 12/5/2017, Positive, Amphetamine, 27.2 ng/mL; Methamphetamine, 132.5 ng/mL, THC 14.0 ng/mL.

32. Neither parent has successfully completed the services ordered in the Dispositional Decree, nor have they taken the necessary steps to be reunified with their children.

33. Neither parent has visited with the children since approximately January 2018.

Appellant Mother's Appendix Volume III at 30-42. The court also found a reasonable probability that continuation of the parent-child relationship poses a threat to the well-being of the children, that termination of the parent-child relationship is in the children's best interests, and that DCS has a satisfactory plan for the care and treatment of the children, which is adoption.

### *Discussion*

[4] In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[5] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id*. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id*. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*. "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court

when reviewing the sufficiency of the evidence." *Id*. at 640. The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B)

[6] Mother focuses her argument on whether DCS proved, by clear and convincing evidence, that there is a reasonable probability that the conditions that resulted in S.H. and A.H.'s removal and/or continued placement outside the home will not be remedied. Mother contends that she had made substantial improvements in her life at the time of the fact-finding hearing and asserts that she had secured a stable and legal place to live, had recently been employed by a placement agency at a local factory but had become "temporarily unemployed due to the need to provide care for Father and due to the need to meet minimum financial thresholds in order to qualify for housing assistance," had been sober from methamphetamine use for eight months and had not consumed marijuana in several weeks, and had recognized her need for mental health treatment and began attending Centerstone services more regularly. Appellant Mother's Brief at 15.

[7] Father argues that DCS did not present clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of S.H. or A.H. and that "[t]he only way that the continuation of the parent-child relationship with Father could have posed a threat to S.H. and A.H. would be if the conditions that led to their removal from Father's custody were unlikely to be remedied." Appellant Father's Brief at 12. He contends that he had sufficiently addressed

two of the three original reasons for opening the CHINS case, had completed his substance abuse assessment as a step toward sobriety, and that "although he fell short in numerous other areas while working with family case managers," he was "always consistent about attending supervised visits" and was an attentive, engaged father. *Id.*

[8] DCS maintains that neither parent specifically challenges any of the court's findings of facts and the court's unchallenged findings support its judgment. It contends that the court properly discounted recent parental efforts in light of their habitual patterns of conduct and argues that the evidence of Parents' pattern of inability, unwillingness, or lack of commitment to address parenting problems and to cooperate with services, of failing to cooperate with rehabilitation efforts, and of otherwise failing to follow the participation orders demonstrate the requisite reasonable probability Parents would not become fit parents.

[9] In determining whether the conditions that resulted in the children's removal will not be remedied, we first identify the conditions that led to removal and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *See E.M.*, 4 N.E.3d at 642-643. In the second step, the court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has

discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of her future behavior. *Id.* The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services, and, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.* A parent's habitual patterns of conduct must be evaluated to determine the probability of future neglect or deprivation. *See K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1231 (Ind. 2013).

[10] To the extent Parents do not challenge the trial court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[11] Mother cites to her testimony that she has "been sober off of methamphetamines for almost eight months now" and was "not currently still using" marijuana, that she has attended DCS's recommended therapy regarding drug use on multiple

occasions, that she and Father have their own apartment, and that she voluntarily left her position with employer Kamic to qualify for the apartment. Transcript Volume III at 27, 34. The record reveals, however, that Mother has inconsistently drug screened and screened positive for substances on eleven occasions in the period spanning from June 2016 to December 2017; did not complete a substance abuse assessment until March 16, 2017, when Centerstone diagnosed her with methamphetamine use disorder, cannabis use disorder, borderline personality disorder and PTSD and recommended her for the dual diagnosis program; and failed to maintain consistent housing and employment. Further, Mother admits she did not complete her substance abuse therapeutic services and testified at the termination hearing that marijuana was still in her system and she uses it because she has mental health issues "that [she] can't afford medications for." *Id.* at 34.

[12] As for Father, the record reveals that he has inconsistently drug screened and has screened positive for substances on nine occasions in the period spanning from June 2016 to December 2017, including screening positive for both amphetamine and methamphetamine on October 11 and December 5, 2017; that he did not complete a substance abuse assessment until March 16, 2017, when he was diagnosed with methamphetamine use disorder and cannabis use disorder; that he did not participate in the Intensive Outpatient Treatment to which DCS had referred him on March 17, 2017; and that he failed to maintain consistent housing and employment.

[13] Based upon the record and the court's unchallenged findings, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to the children's removal will not be remedied.

[14] Mother and Father additionally argue that termination is not in the best interests of S.H. and A.H. Mother contends she struggled and failed when she was provided minimal services, but that she "thrived and exceeded expectations" when provided with the appropriate services. Appellant Mother's Brief at 11. She asserts that, even when she could not meet the threshold goals set by DCS, she continued to demonstrate her desire to work towards the best interests of her children, that termination in this case "provides no extra stability, consistency, or assurance" to S.H. and A.H., and that the "only net effect, in the short run, is to withdraw any assistance or services that can be afforded to [her] as she continues to get her life back in order." *Id.* at 17-18. Father contends, without citation to authority, that DCS "must show more than the generally accepted opinion that children will only succeed in a stable, permanent environment, because that alone is not sufficient to support the termination of parental rights." Appellant Father's Brief at 14. Father further asserts that he "made progress, albeit slow progress" over the course of the case and that his struggles with poverty did not impact his children to a degree warranting termination. *Id.* at 15.

[15] In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence.

*McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry. *Id.* at 648.

[16] Court Appointed Special Advocate Bill Fechter testified that "in the best interest of the children [termination of parental rights] should proceed" and, when asked to state why, answered in part "my contacts with the kids specifically with mom and dad in meeting in November and December where they have been going through a lot of trauma in their marriage," "they are having difficulty getting jobs, holding jobs, . . . finding places to live," and "I understand there [sic] in a difficult point in their life and I just think it's going to be a while for them to recover from that, and get their lives on [the] path they need to, and I don't think the kids should have to wait." Transcript Volume II at 200-201. Based on the testimony, as well as the totality of the evidence in the record and set forth in the court's termination order, we conclude that the

court's determination that termination is in the best interests of the children is supported by clear and convincing evidence.

[17]     To the extent Father argues that DCS does not have a satisfactory plan for the care and treatment of S.H. and A.H., we note that adoption is a "satisfactory plan" for the care and treatment of a child under the termination of parental rights statute. *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009). This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*. DCS Family Case Manager Rebecca Claycamp indicated that DCS identified a permanent adoption home for S.H. and "several good possible adoptive homes" for A.H. and sibling, Ra.H.,[1] testified that DCS "like[s] to try and [place] siblings together when at all possible," answered in the negative when asked "under what you had discussed previously that's not possible at this point in time" and stated "it's not safe," and indicated that S.H. "being able to stay with his siblings is not safe." Transcript Volume III at 40.

---

[1] As Mother indicates in her brief, DCS initially filed a CHINS action on June 10, 2016, with regard to Ra.H., born April 9, 2009, and we observe that the trial court stayed the matter at the February 21, 2018 hearing "pending completion of paternity testing" in a collateral paternity case. Transcript Volume III at 3.

## *Conclusion*

[18]    We conclude that the trial court's judgment terminating the parental rights of Mother and Father is supported by clear and convincing evidence. We find no error and affirm.

[19]    Affirmed.

Bailey, J., and Bradford, J., concur.